I hear the next case, United States v. Meisler. Ms. Zimmer? Good morning, Your Honors. May it please the Court, my name is Kimberly Zimmer, and I, along with Brittany Anger, represent the appellant. Move the microphone down. Certainly. I represent the appellant, Ms. Bonnie Meisler. Your Honors, as we've submitted in our briefs, throughout the trial and the appeal, the government has attempted to redefine and recharacterize its own allegations and its own proof. It is in the context of the allegations in the indictment and the proof at trial that we ask that our arguments be evaluated. It is the government's burden to show that Bonnie Meisler had to know what direct supervision required. She had to know that it required Dr. Coturro's physical presence in the office. Didn't she tell the investigating agent that she was very familiar with the Incident 2 regulations? And there was evidence also that in a prior practice she had been aware of billing regulations and responsible for billing Incident 2. She was adamant that she knew what Incident 2 required. Your Honor, respectfully, we would say no to you on that. And there's two different parts of that that I want to address. Number one is that the testimony of that agent, and when you take it all in context, and we do note that there was one part where she claims that she knew what direct supervision was, and that was on direct examination. But the testimony of that agent, in total, needs to be taken in context. And basically what she's saying is that this person was the billing professional, this person was familiar with Medicare guidelines, and that this person, Bonnie Meisler, knew, understood Incident 2. Isn't that what Bonnie Meisler herself told the agent, though? In one portion of her testimony, as I said, out of context. But there's a context to that that is important to understand. Let me interrupt for just one other question. Do you agree that the Incident 2 regulations did not change in any significant way during the relevant period? They always required that the doctor be in the office suite in order to bill at 100% for the PA or the RN? I do agree, Your Honor, that direct supervision for Medicare purposes was required. Yes, I do agree with that, although there was some clarification on that, because you have to remember that during this time period, we have Skype, we have teleconferencing, we have telephones. So what kind of supervision? Because the doctor does not need to be in the office suite. No. But I do want to go back to your point. I thought the doctor absolutely needs to be in the office suite. He needs to be in the office suite. He does not need to be in the exam room with the patient. Well, I realize that, but that aspect is what is key, and that's inconsistent with his presence in Nevada when your client was sending bills. Understood, Your Honor. Yes, and we agree with that. But I think it's really important, Your Honor, that you recognize that when you are trying to, when you are going to criminalize the application of a Medicare billing guideline, okay, we're not talking about a fraud case in the traditional sense where we have a double billing or we have a straight-out billing when a physician is not present. If doctor, when Dr. Coturo is in that office suite, he, those practitioners can bill under his identifier at the 100% rate. That we know. The problem is in this case that what happened, appears to have happened, was that he was nowhere near any of that. He was out of state. He was back and forth, Your Honor, yes. He was back and forth, but he wasn't there. And you've got a case where you have Ms. Meislin, who is the only employee, right, who worked at UPM for the whole period, right? Correct. She was the billing manager, and after September 2010, she was the only person who had anything to do with submitting claims. And I know you say it's taken out of context, but you have a witness saying that he had a specific conversation with her about the improprieties of her billing under the Incident II regulation. Why, you know, you have to show that this evidence is insufficient. Your Honor, I understand what you're saying, and I still maintain it is insufficient, but one of the arguments that I really would like to focus on, and I think it addresses Judge's question, is I'll let you have all the time you need, but just related to that, didn't she admit that she knowingly billed improperly for Dr. Bajani because she couldn't make as much money working elsewhere? That's exactly where I want to go, Your Honor. At a minimum, Bonnie Meislin should get a new trial. Individually and cumulatively, she was completely denied a fair trial. To be admissible under 404B, the conduct must be sufficiently similar and to permit a reasonable inference of knowledge or intent. That is well-established Second Circuit law. The only, only similarity between the billing that occurred here is it was a medical office and it was medical billing. It was not even Medicare billing. Your Honor, it turned on, in both cases, on the presence or absence of the doctor, didn't it? Completely different context, yes. Completely different context. In the Bajani situation, it's billing for services that were not performed. He wasn't there. He didn't perform them. In this circumstance, in order for her to commit a crime, she needs to be keeping track of when the doctor's in the office and— She wasn't there very often. Your Honor, but there's no similarity between the context. The mission of Stell testimony guts 404B. You might as well not have a 404B. All of your case law supports that this woman should get a new trial on the 404B issue. It was straight-up propensity evidence. The government wanted the jury to conclude that if Meislin committed the health care fraud in the past, she would do it again. That's the only purpose. It does nothing. It speaks nothing to her understanding of this Incident 2 guideline. There is no proper purpose, and it is clearly harmful. It is clearly prejudicial. And the judge himself, both in his limiting instructions and in his decision to admit it, again, assumed a similarity of conduct that simply does not exist. And, Your Honor, I would point you to— I mean, there's much more Second Circuit case law on this, but it is clear that sufficiently similar conduct must be found. There is no way that this 404B evidence can be upheld, Your Honors. There is no way. There's no point in having a rule if this kind of evidence gets into a criminal trial. There's— You'll have, I think, two minutes to rebuttal. Thank you, Your Honor. Good morning. May it please the Court. Stephen Clymer for the United States. I'd like to begin by addressing two inaccurate characterizations that permeate the defense briefs and also surface this morning at oral argument. One mischaracterization involves the charges and the government's theory here. One mischaracterization involves the proof and whether the government made a certain concession that is described in the defense briefs. The first mischaracterization involves the charges in this case. It was not the government's theory that this was a case involving simply this incident to a billing requirement and a technical violation of the requirement. As the indictment makes clear, and I'll direct the Court's attention to appendix page 46, that has the charging language in the indictment, the theory here was that the practice billed for Dr. Kothuru's services when he was not there. One component of that was the incident, too, but the wrongdoing here was to claim that Dr. Kothuru provided services either by being present and seeing a patient himself or by directly supervising from inside the office suite when, in fact, he was in Las Vegas when the patients came to be seen. So when the defense claims over and over again in their briefs this was simply about the incident in two rule, it's not simply about the incident in two rule. It's about billing for services not performed. In fact, the district court in its decision denying the Rule 33 and Rule 29 motion specifically described the government's case as being involving, quote, services not rendered. So when the defense says – But they would have – had the PA and the RN been Medicare certified, they would have been entitled to bill, let's say, 85 percent, right? Correct. If they had been, they would – Services – doesn't the government agree that services were provided, just it wasn't Dr. Kothuru? Not Medicare reimbursable services, Your Honor. Not even 85 percent? No, Your Honor, and for this reason. First of all, if a PA or a physician's assistant or a nurse's assistant provides services, they have to bill under their own provider number. They don't have provider numbers in this case because they were not Medicare credentialed. So the false claims that went in represented to the Medicare program that Dr. Kothuru performed those services. So none of them could have billed for Medicare at all because they weren't credentialed? That's correct, and that goes to the loss claim, Your Honor. They were not credentialed, and furthermore, if they bill for the 85 percent, the claim form has to be under their provider number, which they didn't have in this case. So what was being represented by Defendant Misland to Medicare over and over and over again is Dr. Kothuru was performing services, and those services could have been him seeing the patient personally or it could have been a PA or a nurse practitioner seeing the patient under his direct supervision. We didn't set out to prove at trial which one of those two things wasn't occurring. They both weren't occurring because Kothuru couldn't do either one, couldn't see the patient or couldn't provide direct supervision, because he was in Las Vegas when the patients were coming in. Now, in fact- Isn't there room for some confusion there? I mean, if Dr. Kothuru has his own PTAN or whatever the number is and he's responsible for direct supervision, the PA or the RN are providing the services, there's some service, some medical service that's being rendered, and the agent's testimony didn't quite get to that level of detail, did it? About what she knew and appreciated? Didn't that focus on incident two? Let me answer that, Your Honor. First of all, there was evidence, and it's cited at pages 10 and 11 of our answering brief, that there were many days when there was no medical professional in the practice at all, and non-medical clerical staff were seeing patients, dispensing prescriptions for Schedule II drugs, and performing medical tests. So on those days, there was no possibility of confusion. On days where the physician's assistant, Al Shumway, saw patients, there was a possibility there was some confusion, but the jury found that there wasn't. I mean, that was a contested issue at trial about whether Meislin didn't understand the rules, and the jury made a decision here upon abundant evidence. She told people she understood the rules. She talked about incident two. Shumway showed her the regulations. She ignored him when he complained about the way she was billing. She lied to an investigator who came in when she said, Doctor, we always saw the patient when we billed for it. She talked to Stell about having committed identical. And I know Ms. Zimmer said it's completely different. It's identical fraud at the Bajani practice. Well, it was to a private insurer submitting bills for co-pay or co-presence, I guess, something like that. That wasn't Medicare fraud. It was more than that, Your Honor. In the Bajani practice, she admitted to Stell three different kinds of fraud. The first kind of fraud she admitted, and the district court talked about this, was billing when Bajani wasn't there to perform services, which is exactly the same kind of fraud that she was committing in this case. So it's not a matter of being symmetrical. It was close to identical. And Ms. Zimmer refers to the Second Circuit decisions. Curley and Cadet are the Second Circuit decisions. Both are cited in our brief, and they make crystal clear that the district court's decision here was not an abuse of discretion to admit that. Can I draw your attention to pages 62 and 63 of your brief, where you're talking about Section 1347? Yes. And as I understand it, you're saying that, and correct me if I've got it wrong, that the defendant need not be aware that his or her conduct is lawful to be convicted under 1347. Thank you, Your Honor. I made a mess of this, and I'd like to clarify. Because that interpretation seems to read willfully out of the statute. I think not, Your Honor, if I could provide some background. When we wrote the brief, I incorrectly characterized this clarifying legislation. That's why I sent a letter to the court to explain that. The clarifying legislation only undid that aspect of the Ninth Circuit cases requiring knowledge of the specific statute addition. It did no more than that. So to the extent our brief says otherwise, our brief was wrong. So it's knowledge of the section. So that's the correction that you just sent? That's the correction I just sent. I'm sorry. I thought you were saying it requires knowledge of unlawfulness, but not of the specific section that was breached by submitting the bill. That's actually incorrect, Your Honor. Let me clarify that. So the highest level of mental state one could interpret out of the word willfully was the one the Ninth Circuit did, which was knowledge of the specific section. Congress said that's not right. The next step down, I suppose, would be knowledge of unlawfulness generally. And on that, it is not clear whether the statute requires that or not. This Court has indicated in two decisions the answer is no, that only an intent to defraud is required. And let me describe the decisions. The first decision is the Singh decision out of 2004 from this Court. That was a precedential decision on a health care fraud case somewhat similar to this one. The Court had a sufficiency claim before it. It did not specifically describe the elements of 1347, but in its discussion of the sufficiency of the evidence, all it talked about was the fact that the evidence was sufficient to prove, quote, an intent to defraud. There was no mention in the Singh decision at all about a requirement of knowledge of unlawfulness. Third point I want to make. In September of this year, there was a non-precedential decision out of this Court called Jafari, J-A-F-A-R-I. I can get the site for you if you give me a moment. And in that decision, as I say, it's non-precedential, the Court again discussed 1347 as if the mental state requirement was only intent to defraud. No mention in that decision of knowledge of unlawfulness either. So I think to the extent there's any authority in this circuit right now, and the other circuits don't agree on this, there's difference of opinion, the requirement is only intent to defraud. All that said, Your Honor, I'll say two things. One, here the judge charged the unlawfulness requirement, and we believe the evidence proved it. Second, I'm not sure there's much space between a requirement of intent to defraud and a knowledge of unlawfulness. It seems to me if a defendant is acting with intent to defraud, which is what we believe is the appropriate instruction in one of these cases, I don't see how the defendant can claim I didn't know it was unlawful if I did in fact intend to defraud. You'd have to know what the representations are required to be paid. I think that's correct. So I guess you have to show at least some kind of knowledge of the regulations, or not necessarily the specific section number or whatever, but at least what the regulations require. In this instance, the regulations require, A, a Medicare reimbursement number for either the physician assistant or the doctor, and, B, if the physician assistant doesn't have one, or if the claim is submitted under the doctor, the doctor either supervises or performs the service himself or herself, correct? Correct. All right. And on this record, we know that the defendant made representations of knowledge of those regulations, did all the billing, and, C, when actually the agent came to the utical office, was there not representations with regard to changes in some of the billing codes of the prior bills? That's correct, Your Honor. To cover up the knowledge of what those were? That's correct, Your Honor, to cover it up. I mean, rarely you'll ever have someone say to an agent, oh, I knew that the doctor had to supervise this, but I decided to go ahead and bill it under that number anyhow. I mean, you have to judge it from a course of conduct, generally. Your Honor, I think that under the facts of this case, the distinction between intent to defraud and knowledge of unlawfulness really becomes academic. I mean, here the evidence is overwhelming with respect to both of those things. I don't think this Court has to resolve that issue in this case to affirm the conviction, but if the Court's inclined to, again, I'd suggest that this Court's authority so far in Jafari, although it's not in Presidential, and in Singh, pushes in the direction of the requirement being an intent to defraud, not knowledge of unlawfulness. In calculating the loss, the district court relied on the amount allowed. Correct. Should it have relied instead on the amount paid? No, Your Honor, and this again goes back to the Singh decision. In Singh, when the Court first sentenced, it relied on the amount submitted, which is higher than the amount allowed. It's whatever the doctor says to Medicare, please pay me this amount, perhaps knowing full well Medicare has a fee schedule that's lower. And in Singh, the Court remanded with essentially instructions to let the defense make a showing that the doctor only expected for his intended loss to do the amount allowed. So the authority in both the guidelines and in this circuit is that at best for a defendant, the amount allowed ought to dictate the loss amount for the guidelines, not the amount submitted. And that's what the district court here did, was the amount allowed. And for the restitution figure, the actual loss, I think, is correct, and that's what the district court here relied on. I see my time's up here, and if I could just make one other point, because I want to clarify one other thing in the record that I think is disturbing and misleading. The other mischaracterization I wanted to describe in the record is the defense says over and over again that the government conceded or acknowledged or admitted that the services were performed. That is simply not true. The only citation in the record that the defense gives to support that claim, which is made, I think, eight times between the opening and the reply brief, is page 729. Page 729 is the testimony of a witness named Peggy Conley, not a case agent, not the person dictating the government's theory in this case. She's a private contractor, and all she testified to at that citation was that she personally was conceding that the physician's assistant and nurse practitioners saw the patients. She doesn't say how many times they saw them, when they saw them, what it has to do. So when the court, as I'm sure you'll be very familiar with the record, when you see in the defense briefs claims of government concessions and government acknowledgments about the services being performed, that is simply untrue. We never made that concession, and here there was evidence in the record. Thank you. That's all, Your Honor. Your Honor, absolutely, I want to address that point right up front, okay? That is the Medicare investigator who testifies about the regulations at issue, who testifies about visiting the agent, who says, we are not claiming services are not performed. That is a concession by the government that services were not performed. Moreover, there is no evidence in this record of a service not being performed. There is not a person coming in saying, I was billed for a service that wasn't performed. There is no evidence. Is there any evidence that non-medical personnel? Your Honor, yes, but those allegations were not against Bonnie Miesland. If you're charging for a medical person dispensing drugs and a non-medical person does. Bonnie Miesland had nothing to do with that. That was outside of the Oswego office. She was not charged in that conduct. Dr. Couturo was charged in that conduct. That is the driver of this whole prosecution. Well, how does it matter? How it matters, Your Honor, is they're saying that there were non-medical professionals there and there was. Ultimately, with regard to the fraud charge, how does it matter? Because she did not, the services that were performed in the Oswego office, you don't bill for the scripts, okay? So that's not, we're not talking about that. I haven't recently gone on Medicare, I understand. Okay, but you bill, but there was some testing that happened, some balance testing, some drug testing that happened. That can happen lawfully by non-medical professionals. That can happen by a clerical person. So she doesn't know anything's wrong when there's no medical provider in Oswego for billing for those services. And the government never shows what specifically is billed. That's the other part of the problem. So they not only don't bring people in to say services weren't performed, they don't match it up. They say- They had, what they had was, they had bills for which his electronic signature appeared, but for which it was physically impossible for him to have been in Central New York. And that is correct. And that is why he did not provide direct supervision. But medical professionals who were credentialed elsewhere, and by the way, this credentialing issue is another adaptation by the government. There's no allegations about credentialing in the indictment. And this Shumway who testified was credentialed elsewhere. Were any of the physician's assistants or nurse practitioners from UPM, were they credentialed? They were- Were any of them? They were credentialed for other providers. They never got credentialed here. And none of that- Not Medicare. So none of them could have been Medicare for unsupervised service? I believe that Conley testified that Shumway was testified for another provider. You get credentialed at each provider. So this practice never credentialed them. But I do believe they were otherwise qualified and credentialed. And moreover, nothing there ties to Bonnie Mislan. Okay? Where's the proof that she knew they weren't credentialed or that she was responsible for credentialing them? She knew what went on the claim form and she knew that there was no- that they didn't have a Medicare ID number. But she- Didn't she? Yes. Wait a second. So she fills out the bill and she's got to put in a Medicare provider ID number. And she knows that the doctor is in Phoenix, Arizona. And I presume that she knows that it's impossible for the doctor to have provided services. So she approves the bill of Medicare for which the representation is that the doctor either provided the care or directly supervised it. How has that not been a fraudulent representation? Because she knows he's not there, Your Honor. So if she has a good faith belief that he is providing direct supervision and is not aware of the requirement that he be in the office suite- Okay. Thank you. All right. Thank you both for your arguments. The Court will reserve decision. Thank you very much.